# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF ARKANSAS
## FORT SMITH DIVISION

JEFFERY DEAN PARKER                                            PLAINTIFF

v.                Civil No. 03-2135

THE WALDRON, ARKANSAS, SCHOOL DISTRICT                         DEFENDANT

### O R D E R

Now on this 14th day of March, 2006, comes on for consideration **Defendant's Motion For Summary Judgment** (document #81) and **Motion To Strike Plaintiff's Reply To Brief In Reply To Plaintiff's Response To Defendant's Motion For Summary Judgment** (document #106), and from said motions, the supporting documentation, and the responses thereto, the Court finds and orders as follows:

1. Plaintiff Jeffery Dean Parker ("Parker") alleges that defendant, the Waldron, Arkansas, School District (the "District") violated his First Amendment rights by retaliating against him for engaging in constitutionally-protected speech. The District denies this allegation, and now moves for summary judgment.

2. Summary judgment should be granted when the record, viewed in the light most favorable to the nonmoving party, and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. **Walsh v. United States, 31 F.3d 696 (8th Cir. 1994).** Summary judgment is not appropriate

unless all the evidence points toward one conclusion, and is susceptible of no reasonable inferences sustaining the position of the nonmoving party. **Hardin v. Hussmann Corp.**, 45 F.3d 262 (8th Cir. 1995). The burden is on the moving party to demonstrate the non-existence of a genuine factual dispute; however, once the moving party has met that burden, the nonmoving party cannot rest on its pleadings, but must come forward with facts showing the existence of a genuine dispute. **City of Mt. Pleasant, Iowa v. Associated Electric Co-op**, 838 F.2d 268 (8th Cir. 1988).

3. **Local Rule 56.1** requires a party moving for summary judgment to "annex to the notice of motion a separate, short and concise statement of the material facts as to which it contends there is no genuine issue to be tried." Any of these asserted facts which the responding party does not deny are deemed admitted. This process is designed to give the Court a factual starting point in evaluating the motion.

In the case at bar, those statements have not been particularly helpful. The District's statement sets forth mostly general statements about Parker's allegations and the applicable law; what the Court has ordered in previous rulings; and the District's conclusion that Parker cannot prove his case. Parker's response merely asserts that there are disputed issues of fact. The Court is thus left to start from scratch in outlining the issues.

From the allegations of the Second Amended Complaint, and the Answer thereto, the Court gleans the following significant facts which appear to be undisputed:

* Parker is the parent of a student, Jerry David Dean Parker ("Jerry") who attended school in the District during the relevant time period. During the 2002-03 school year, Jerry was in the eighth grade, and attended the District's Middle School. He played on the eighth grade boys' basketball team.

* Following a boys' basketball game on December 16, 2002, Jerry was involved in an altercation with some of his teammates in the locker room.

* On December 17, 2002, Jerry was summoned to the office of Middle School Vice Principal Dan Brashears ("Brashears") because of the altercation, and was suspended.

* On December 17, 2002, or shortly thereafter, Parker met with District Superintendent Boyce Watkins ("Watkins") and Middle School Principal Syble Owens ("Owens"). During the meeting, Parker was critical of the District's administration.

* Two more meetings took place between Watkins and Parker between December 17 and December 29, 2002, in each of which Parker was critical of the administration.

* On December 30, 2002, the District held a hearing regarding Jerry's suspension. Watkins was present. During the hearing, Parker was critical of the District's coaching staff, in

general, and one of the coaches involved in the December 16 incident, in particular. He was also critical of the way Watkins and Brashears handled the investigation of the incident.

* At the conclusion of the hearing, the School Board sustained the administration's decision to suspend Jerry.

* On January 15, 2003, Parker published, in a local newspaper, an "open letter" critical of the coaches and the administration of the District. The letter spoke of its author's belief that there was "far too much violence being allowed to occur in our school's athletic program," and his additional belief that there was "a distinct possibility that this tactic used by the coaches of violence against children . . . is a *deliberate* tactic and a practiced method of operation in our school's sports program." (Emphasis in original.) Parker went on to opine that "[t]his behavior from the coaches is so freely used because the administrators and the majority of the school board members, who are supposed to represent our community, sit idly by and do nothing to stop it!"

* On January 21, 2003, a School Board meeting was held. Parker arranged for his attorney to be present and to address the Board about an incident that had occurred on January 1, 2003, involving the girls' basketball team. Parker also arranged for television coverage of the meeting. The members of the School Board knew or had reason to know of Parker's role in orchestrating

the attorney's address and the attendant publicity.

* During the January 21 Board meeting, Parker was critical of Watkins and the District's athletic program. He requested that the Board not renew Watkins' contract as Superintendent.

* On January 22, 2003, the local paper published a letter signed by twenty-two teachers and coaches of the District, responding to Parker's earlier letter. This letter was supportive of the administration.

* On May 29, 2003, Middle School teacher Keith Hollemen was presented, in connection with his retirement, with a "Certificate of Recognition" for "Pissing off the Parker Family."

4. In order to establish a *prima facie* case that the District retaliated against him for engaging in constitutionally-protected speech, Parker must show more than that he was subjected to retaliation for engaging in protected speech. Because a governmental entity such as a school district cannot be held liable for a constitutional tort on a theory of *respondeat superior*, **Monell v. Department of Social Services of City of New York**, **436 U.S. 658 (1978)**, Parker must show that such retaliation occurred either (a) pursuant to some official policy of the School District, or (b) that retaliatory conduct in violation of First Amendment rights was so pervasive among employees of the District that such conduct could fairly be said to constitute a "custom or usage" of the School District.

A review of the pleadings in connection with a previous motion for summary judgment reveals that there is no allegation of an official policy of the School District to retaliate against a patron who criticized the District, nor has Parker offered any evidence of such a policy. The District now suggests that Parker likewise cannot produce evidence that there was any widespread and pervasive custom of retaliatory conduct.

5. When basing a **§1983** claim on custom or usage, the Eighth Circuit has held that the plaintiff must show:

> (1) The existence of a continuing, wide-spread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;
> (2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and
> (3) That plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was the moving force behind the constitutional violation.

**Springdale Education Association v. Springdale School District**, **133 F.3d 649, 653 (8th Cir. 1998)**.

To be sufficiently "continuing, wide-spread, and persistent," the conduct must have become so "permanent and well-settled" as to have the force and effect of law. **Jane Doe A By and Through Jane Doe B v. Special School District of St. Louis County**, **901 F.2d 642 (8th Cir. 1990)**.

In Arkansas, the policy-making body of a school district is its board of directors. **Springdale Education Association**, *supra*.

6. Because the District does not question Parker's assertion that he was engaging in constitutionally-protected speech, the Court turns directly to the issue of whether Parker can make out a submissible case that there was a continuing, wide-spread, persistent pattern of unconstitutional misconduct (specifically, whether there was a pattern of retaliation against patrons who complained about District employees) by the District's employees, of which the District had notice and which they tacitly authorized or towards which they displayed deliberate indifference.

In support of his case, Parker offers the following Declarations:

(a) The Declaration of Kevin Smalling, a School Board member from 1999-2005. Smalling avers, among other things, that the parent of a student in the District, Caussandra Holmes, had addressed the School Board at a meeting in May, 2002, at which time she had said that "whenever parents complained or talked to a coach about a concern, the next thing they knew their daughter would be moved from A string to B string."

Smalling further averred that both before and after the January 21, 2003, School Board meeting, he received letters from parents saying that "every time a parent attempted to complain about anything, or criticize anyone, then their kids suffered some form of retaliation. . . . were picked on by teachers or punished

in some way." At the January 21 meeting, he received and read a packet of documents distributed by Holmes to each School Board member, "and they made reference to kids or parents suffering retaliation any time parents criticized Garner or Gorman [the girls' basketball coaches]."

Finally, Smalling averred that in May or June, 2003, he spoke with fellow School Board members James Scott and Terrell Moore about the "Pissing off the Parkers" certificate, and his understanding that Owens, a District administrator, had been involved.

(b) The Declaration of Kandis Hunsucker, in which she avers that in 1997 or 1998, when her daughter Heather was playing basketball for the District, any time she or her husband complained to the coaches about anything, Heather suffered some form of retaliation. Hunsucker avers that she discussed the situation with two District Board members, Harrell Cabe and Hershal Sims.

Hunsucker further avers that after the School Board meeting in January, 2003, she reminded Sims about what she had told him in 1998 about the coaches.

Hunsucker also avers that she was present in the Spring of 2003, when Owens presented Holleman with the "Pissing off the Parkers" certificate. She avers that a large number of other teachers and staff at the Middle School were also present.

Hunsucker avers that she complained to Watkins about this matter, and that, the next day, Garner and Gorman came to a classroom where she was working and loudly criticized her for bringing the matter to Watkins' attention.

(c) The Declaration of Caussandra Holmes, in which she avers that she spoke to the School Board at a meeting in May, 2002, telling them that when parents complained to coaches about how their children were being coached, those children sometimes found themselves moved from first string to second string.

Holmes also avers that she told School Board member Kevin Smalling that she believed Middle School Principal Polly Owens was making her "sign in" when she came to observe basketball practice because she had been critical of the basketball coaches, and that her husband reported "his similar run-in" with Athletic Director Bruce Sykes to School Board member James Scott. She avers that she and her husband both expressed similar sentiments to various School Board members between May, 2002, and January, 2003, and handed out packets of information about this perceived conduct to School Board members at a Board meeting on January 21, 2003. Finally, she avers that she sent a letter to Athletic Director Sykes and each member of the School Board on January 15, 2003, complaining that coaches were treating players unfairly if they believed the parents had complained about the coaching.

Giving the foregoing Declarations all their reasonable

inferences in favor of Parker, as it is required to do when evaluating the pending motion for summary judgment, the Court believes they constitute evidence which, if believed by the trier of fact, would tend to prove that, starting in 1997 or 1998, various parents had put School Board members on notice that they believed that either they or their children suffered retaliation at the hands of District employees when they lodged complaints. The events surrounding the presentation of the "Pissing off the Parkers" certificate - especially the fact that a number of teachers and at least one administrator were said to participate - would support an inference, favorable to Parker, that the District either remained indifferent, or tacitly authorized, this conduct.

7. The District objects to Parker's reliance on the above witnesses, contending that, insofar as Parker relies on them, his response to the motion for summary judgment was not timely. In support of its objection, the District points out that Parker was given an extension of time to respond to the motion, but only because of a claimed need to depose certain school officials. It further points out that as to Hunsucker, Holmes, and Smalling, Parker had or could have had their Declarations in time to file a response to the motion without obtaining an extension.

While it is true that the extension was given so that certain school officials could be deposed and it is also likely true that Parker could have obtained and used the declarations in question

earlier, it does not necessarily follow that the objection should be sustained. The Court does not recall any stipulation or requirement that, if the requested extension be granted, Parker could then use only materials obtained in the newly permitted depositions -- and be prohibited from using that which he might have already had in hand. As counsel well know, it cannot always be predicted as to what new and useful information might be obtained in depositions. Thus, it might well be that Parker learned nothing from the permitted depositions which, in his judgment, was better or more useful than that which he might have already had in hand. Absent any limitation on what Parker would be permitted to use in his Response after the extension was granted, the objection in question must be overruled.

8. Finally, the Court looks at the issue of whether Parker can offer sufficient evidence to go to the jury on the issue of whether he was injured by acts pursuant to the alleged District custom, i.e., that the custom was the moving force behind the alleged constitutional violation.

In this regard, Parker relies on his own Declaration, in which he avers that, prior to Jerry's suspension from school, the District had purchased pizza from his business, the Pizza Barn, for consumption at school or school events. After Jerry's suspension and Parker's criticisms, he avers that the District no longer patronized the Pizza Barn, and that his business fell off

to the point where he had to sell it. He avers that he knows of no other factor which could have caused this decline except for his January 22, 2003, letter to the newspaper.

Parker further avers that, because the District did not put a stop to the conduct complained of, he was subjected to the humiliation of the "Pissing off the Parkers" certificate.

Giving these averments the inferences favorable to Parker that can be drawn from them, the Court finds that Parker has shown the existence of a genuine dispute on the issue of damages proximately caused by a constitutional violation.

**IT IS THEREFORE ORDERED** that **Defendant's Motion For Summary Judgment** (document #81) should be, and same hereby is, **denied.**

**IT IS FURTHER ORDERED** that defendant's **Motion To Strike Plaintiff's Reply To Brief In Reply To Plaintiff's Response To Defendant's Motion For Summary Judgment** (document #106) is **denied.**

**IT IS SO ORDERED.**

                                        **/s/ Jimm Larry Hendren**
                                        **JIMM LARRY HENDREN**
                                        **UNITED STATES DISTRICT JUDGE**